IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

HOWARD MERRELL                                                    PLAINTIFF

v.                          NO. 3:17-cv-00213 PSH

NANCY A. BERRYHILL, Acting Commissioner                           DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Howard Merrell ("Merrell") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Merrell maintains that the ALJ's findings are not supported by substantial evidence on the record.[1] Merrell so maintains because his residual functional capacity was erroneously assessed. It is his position that a "therapist and treating physician both opined that [Merrell] could not work, and the ALJ pointed to no evidence contradicting their opinions." See Docket Entry 13 at CM/ECF 35. Merrell also maintains that the record casts great doubt on his ability to perform the standing and walking requirements of light work and his ability to maintain adequate concentration, persistence, and pace.

---

[1]  The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Merrell was born on December 17, 1970, and was thirty-eight years old on November 22, 2009, i.e., the day he allegedly became disabled. He filed his application for supplemental security income payments on March 31, 2015, and alleged that he became disabled as a result of impairments that included congestive heart failure, lymphoma, diabetes, sarcoidosis, high blood pressure, joint stiffness, arthritis, neuropathy, chronic pancreatitis, and hepatitis C. The ALJ denied the application on August 24, 2016. The relevant period in this case is therefore from March 31, 2015, through August 24, 2016. The Court will nevertheless briefly review the evidence prior to March 31, 2015, for the purpose of placing his application in an historical context.

Merrell has ably summarized the evidence in the record, and the Commissioner has not challenged the summary. It will not be reproduced, except to note several matters germane to the issues raised in the parties' briefs.

The record reflects that on May 13, 2014, Merrell presented to the Harris Hospital with complaints of an altered mental state. See Transcript at 345-347. He was unable to provide a medical history, and his failure to do so was attributed to possible drug use. He did report, though, that he had experienced similar episodes in the past. An impression of psychosis was made, but no medication was prescribed. He was discharged to a "correctional facility." See Transcript at 347.

Merrell returned to the Harris Hospital the following day with suicidal ideation but no formulated plan. See Transcript at 355-359. He also complained of pain throughout his body. Suicidal ideation, diabetes with hyperglycemia, and homicidal ideation were diagnosed, and he was transferred to the University of Arkansas for Medical Science ("UAMS").

Merrell was hospitalized at UAMS from May 14, 2014, through May 19, 2014. See Transcript at 519-526. He complained of vivid nightmares involving murder and mutilation, expressed homicidal and suicidal ideations, and admitted to previous suicide attempts. He reported that his symptoms had grown worse since he stopped taking hydrocodone and Xanax. He reported chronic pain as his primary stressor. Post-traumatic stress disorder, a psychotic disorder, and amphetamine use in remission were diagnosed. He was assigned a Global Assessment of Functioning ("GAF") of forty-five and prescribed medications that included Celexa, Haldol, Minipress, and Desyrel.

Merrell was thereafter seen by the professionals at Daysprings Behavioral Health/Health Resources of Arkansas ("Daysprings") for his mental impairments on several occasions prior to the date he filed his application. See Transcript at 789-794 (06/04/2014); 798-801 (08/18/2014); 839-841 (08/19/2014); 802-805 (11/12/2014); 806-810 (02/09/2015); 851-853 (02/13/2015). He reported visions, nightmares, hallucinations, spiritual visitations, and homicidal ideations. He also reported a history of drug and alcohol abuse, as well as a history of physical abuse. His symptoms caused him anxiety and prevented him from sleeping at night. He was diagnosed with paranoid schizophrenia and post-traumatic stress disorder. He was continued on his prescription medications. His GAF was in the forty-five to fifty range.

On April 6, 2015, or after Merrell filed his application, he sought mental health treatment at the Harris Hospital. See Transcript at 369-370. He reported hearing voices and smelling decomposing corpses. He had been using illegal substances and had not had Haldol for several days. He left the hospital against medical advice, reporting that he wanted to go home and sleep in his own bed where he felt safe.

Merrell was thereafter seen by the mental health professionals at Daysprings for his mental impairment on multiple occasions.[2] See Transcript at 811-813 (04/07/2015); 814-818 (05/18/2015); 862-864 (06/16/2015); 865-869 (08/06/2015); 870-874 (08/18/2015); 1030-1031 (08/28/2015); 1028-1029 (09/04/2015); 1026-1027 (09/11/2015); 1024-1025 (09/18/2015); 1022-1023 (10/02/2015); 1020-1021 (10/09/2015); 1018-1019 (10/23/2015); 1016-1017, 1010-1015 (10/30/2015); 1007-1009 (11/03/2015); 1005-1006 (11/15/2015); 1003-1004 (11/20/2015); 1001-1002 (12/04/2015); 999-1000 (12/11/2015); 997-998 (12/18/2015); 1047 (01/08/2016); 1045-1046 (02/05/2016); 1037-1038 (02/26/2016); 1035-1036 (03/11/2016). His symptoms continued to persist, symptoms that included visions, nightmares, and hallucinations. He reported, though, that his medication helped reduce the frequency and severity of the episodes. He also reported that music, specifically playing with his band, helped reduce the frequency and severity of the episodes and helped relieve his anxiety. There appears to have been a situational component to Merrell's anxiety as he was oftentimes worried about his physical health and about meeting his child support obligations. He continued to be diagnosed with paranoid schizophrenia and post-traumatic stress disorder, and he was continued on his prescription medications. His GAF was repeatedly in the forty-five to fifty range.

On December 11, 2015, or during the period Merrell was being seen at Daysprings, Tammi Ivy ("Ivy"), a Daysprings therapist, wrote a letter to the Jackson County, Arkansas, Child Support Enforcement Office on behalf of Merrell. In the letter, Ivey represented the following:

---

[2] Merrell was occasionally seen via telecommunications technology.

> This letter is in regards to … Merrell. He is currently receiving mental health services through our Newport Clinic and has been doing so since May of 2014. His current diagnosis is Schizophrenia and Post Traumatic Stress Disorder. Services that he receives includes weekly individual psychotherapy and mental health paraprofessional services as well as medication management approximately once every 3 months. He is unable to maintain employment due to his physical and mental disabilities and is in the process of obtaining financial assistance through Social Security. …

See Transcript at 934.

Merrell was also seen for his physical impairments on several occasions prior to the date he filed his application. For instance, he presented to the Harris Hospital on April 17, 2014, complaining of pain and swelling in his feet. See Transcript at 382-385, 387-389. He also reported pain in his hips that made it difficult to walk. A CT scan of his right foot suggested the presence of gout. A right foot irrigation was performed, as was a debridement of his right foot abscess. See Transcript at 338-339. A CT scan of his pelvis revealed some arthritis and bursitis. See Transcript at 336. He was diagnosed with diabetic foot ulcer/abscess, diabetes mellitus with uncontrolled neuropathy, and a history of recurrent Hodgkin lymphoma. He was prescribed medication that included Levemir and Norco and instructed to use a walker.

Merrell also sought treatment for complaints that included abdominal pain, high blood sugar, shortness of breath, arthralgia, lymphadenopathy, and pain in his lungs. See Transcript at 619-624 (06/24/2014), 614-618 (09/03/2014), 609-613, (10/02/2014), 604-608 (01/02/2015). A chest x-ray showed no acute process. See Transcript at 665-666. His joint pain, identified at times as arthritis and/or arthralgia, was attributed to sarcoidosis. He was prescribed prednisone. When it proved to be ineffective, he was encouraged to see a rheumatologist.

On April 2, 2015, or after Merrell filed his application, he saw a rheumatologist for immunosuppression with disease-modifying, anti-rheumatic drugs. See Transcript at 597-603. A physical examination revealed no swelling or tenderness in his joints and no weakness in his lower extremities. X-rays of his feet showed erosive arthropathy and possible gout. See Transcript at 657-658. X-rays of his ankles were unremarkable. See Transcript at 659-660. A pelvic x-ray indicated degenerative arthrosis of the hips, see Transcript at 661-662, and a lumbar x-ray indicated mild multilevel discogenic degenerative changes, osteophytosis, and some facet arthropathy, see Transcript at 663-664. A subsequent x-ray showed degenerative disease of the thoracic spine. See Transcript at 379-380. Merrell was diagnosed with impairments that included congestive heart failure, diabetes, neuropathy, and sarcoidosis. He was continued on medication and referred to other professionals for a more thorough evaluation of his impairments.

Merrell was thereafter seen for his physical impairments on multiple occasions. See Transcript at 591-596, 577-590 (05/04/2015);573-577, 651-652 (05/19/2015); 755-781 (06/16/2015); 770-774 (08/04/2015); 823-827 (08/05/2015); 957-962 (10/05/2015); 882-888, 894-896, 900 (10/05/2015-10/07/2015); 1467 (10/08/2015); 1428 (10/09/2015); 1417 (10/13/2015); 1405-1406 (10/16/2015); 1394 (10/20/2015); 1383 (10/22/2015); 1372 (10/27/2015); 986-992 (10/28/2015); 1361 (10/30/2015); 1350 (11/06/2015); 877-888 (11/10/2015); 1334 (11/13/2015);1323 (11/20/2015); 1312 (11/25/2015); 1301 (11/30/2015); 952-956 (12/02/2015); 1267 (12/09/2015); 1255 (12/16/2015); 936-947, 950-951 (12/17/2015); 1243 (01/06/2016); 1558-1562 (01/08/2016); 1231 (01/13/2016); 1218-1219 (01/28/2016); 1552-1556 (02/01/2016); 1192 (02/02/2016); 1181 (02/05/2016); 1169 (02/10/2016); 1157 (02/12/2016); 1146

6

(02/15/2016); 1135 (02/19/2016); 1124 (02/22/2016); 1113, 1566 (02/25/2016); 1547-1551 (03/01/2016); 1102 (03/02/2016); 1091 (03/08/2016); 1569-1572 (03/23/2016); 1080 (03/25/2016); 1543-1546 (05/10/2016); 1539-1542 (05/24/2016); 1573-1575 (05/18/2016). The progress notes reflect that Merrell continued to experience joint pain believed to be caused by sarcoidosis but reported some benefit from methotrexate and other medications. He complained of numbness, tingling, and pain in his arms and legs and was treated for neuropathy. He had difficulty controlling his diabetes and blood sugar, although he was not always compliant with his medication. Testing revealed mild chronic degenerative changes at C3-C4 and C4-C5. The progress notes also reflect that he occasionally used methamphetamine and methadone and had difficulty keeping his appointments because of transportation issues.

On February 1, 2016, Dr. Virgincita Rodriguez, M.D., ("Rodriguez") wrote a "To Whom It May Concern" letter on behalf of Merrell. In the letter, Rodriguez represented that Merrell has "multiple chronic medical issues that limit[] his ability to be able to hold any gainful employment at this time." See Transcript at 1033.

On March 23, 2016, Dr. Lakshman Gollapalli, M.D., ("Gollapalli") saw Merrell for his complaints of pain in his neck, shoulders, abdomen, back, hips, and knees. See Transcript at 1569-1572. A physical examination revealed that although Merrell had generalized muscle pain and tenderness, he had a normal gait and station and normal strength and tone in his extremities. He was able to heel-to-toe, heel walk, and toe walk. Palpation of his cervical joints, sacroiliac joints, and lumbar facet joints failed to reproduce pain. Gollapalli diagnosed a chronic pain syndrome and recommended physical therapy, intervention pain management techniques, and medications.

Gollapalli saw Merrell again on May 18, 2016. See Transcript at 1573-1575. Merrell rated his pain, on average, as about five of ten. Gollapalli noted that Merrell's medication helped control his pain. Gollapalli referred Merrell to a rheumatologist for his sarcoidosis and continued him on medication. Merrell was advised to avoid bed rest but to maintain his normal activities.

Merrell's medical records were reviewed by state agency medical professionals. See Transcript at 61-75, 77-93. They agreed that Merrell was capable of performing light work where interpersonal contact is incidental to the work performed; the complexity of tasks is learned and performed by rote involving few variables and little judgment; and the supervision is simple, direct, and concrete.

A series of documents were completed by Merrell in connection with his application. See Transcript at 220-222, 223-232, 244-246, 247-257, 286. In the documents, he represented that he experiences severe pain in his abdomen, joints, and lymph nodes. It lasts "all the time" and "[n]ever goes away." See Transcript at 244. He can stand/walk for about fifteen to twenty minutes and sit for about twenty minutes before the pain occurs. A typical day consists of primarily of watching television and napping. He can attend to some of his own personal care but cannot put a shirt on or off, or put on a belt, without assistance. Merrell can prepare simple meals, occasionally wash dishes, and do the laundry. He can go outside his home, but he cannot perform any yard work. He can shop for groceries but rarely does so. His hobbies include attending church, playing his guitar, and listening to music. He spends time with others, particularly on Sunday while attending church. His mental impairment gives rise to difficulties with memory and completing tasks.

Merrell completed a work history report in connection with his application. See Transcript at 210. The report reflects that he worked in the construction industry between March of 1993 and December of 2000 and again from January of 2001 through November of 2009. A summary of his FICA earnings during those periods reflect minimal earnings. See Transcript at 170.

Merrell testified during the administrative hearing. See Transcript at 41-54. He takes medication in the form of Lisinopril, Celexa, gabapentin, hydrocodone, and Nexium. He also takes insulin for his diabetes. His medication causes no side effects, although the hydrocodone can cause him to be incoherent at times. He was forty-five years old on the day of the hearing and had completed the twelfth grade in school. When he worked, he was typically paid in cash. Merrell can read and write and perform basic mathematics. During a typical day, he does "[n]ot a whole lot of anything." See Transcript at 44. He cooks, does some laundry, and watches television. He needs help getting dressed but otherwise can attend to his own personal care. Although he once played the guitar, his pain has become so great he cannot play the instrument. Merrell cannot work, primarily because of the pain in the joints of his hands, hips, knees, and feet. He also sometimes experiences swelling in his joints. He cannot stand for more than thirty minutes at one time and was unable to estimate how long he can sit at one time. Were he required to use his hands, he could do so for about ten minutes before he would have to rest them. Merrell has trouble dealing with people in public, and his schizophrenia makes it difficult to be social. He hears voices and "background chatter," see Transcript at 52, particularly when he is under stress. Medication helps reduce the severity of the distraction caused by the voices and chatter.

The ALJ assessed Merrell's residual functional capacity and found that he has the ability to perform light, simple/unskilled work. In so finding, the ALJ gave little weight to Ivy's opinion in her December 11, 2015, letter. The ALJ also gave little weight to Rodriguez's opinion in her February 1, 2016, letter. The ALJ gave great weight, though, to the opinions offered by the state agency medical professionals. The ALJ found at step four that Merrell has no past relevant work but found at step five there is other work Merrell could perform.

Merrell maintains that the ALJ's findings are not supported by substantial evidence on the record. It is Merrell's position that his residual functional capacity was erroneously assessed.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

Merrell maintains that his residual functional capacity was erroneously assessed because Ivy and Rodriguez both opined that Merrell could not work, but the ALJ accorded the opinions little weight. Merrell maintains that the ALJ gave inadequate reasons for weighing the opinions as he did.

The ALJ discounted Ivy's opinion in her December 11, 2015, letter because the opinion "infringes upon a finding reserved for the Commissioner ... and provides no rationale for the sweeping statement." See Transcript at 29. The ALJ discounted Rodriguez's opinion in her February 1, 2016, letter for the following reasons: "[The opinion] infringes upon a finding reserved for the Commissioner ... and provides no rationale for the sweeping statement. The [ALJ] agrees that [Merrell's] impairments limit his ability to work, but [Rodriguez's] opinion is vague as to what those limits are." See Transcript at 29. The ALJ's reasons for discounting Ivy and Rodriguez's opinions are supported by substantial evidence on the record as a whole. The Court so finds for three reasons.

First, it is axiomatic that "[a] medical source opinion that an applicant is "disabled' or 'unable to work' ... involves an issue reserved for the [ALJ] and therefore is not the type of 'medical opinion' to which the [ALJ] gives controlling weight." See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Ivy's opinion in her December 11, 2015, letter that Merrell is "unable to maintain employment due to his physical and mental disabilities" encroaches upon a matter reserved exclusively to the ALJ, as does Rodriguez's opinion in her February 1, 2016, letter that "multiple chronic medical issues ... limit[] [Merrell's] ability to be able to hold any gainful employment at this time." The ALJ could properly discount the opinions for that reason.

Second, a treating physician's medical opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques. Ivy and Rodriguez's opinions are not so supported but are, as the ALJ found, sweeping and vague. For instance, although Ivy identified Merrell's mental impairments and his course of treatment, she failed to offer any support for her diagnoses or explain how the impairments prevent him from working. Rodriguez noted Merrell's "multiple chronic medical issues" but failed to identify what those issues are. Like Ivy, Rodriguez also failed to offer any support for her diagnoses of "multiple chronic medical issues" or explain how his impairments prevent him from working. Thus, the ALJ could properly discount the opinions because they are sweeping and vague.

Third, a treating physician's medical opinion is given controlling weight if it is not inconsistent with the physician's own treatment notes. See Davidson v. Astrue, 578 F.3d 838 (8th Cir. 2009). Viewing Ivy and Rodriguez's opinions in light of their treatment notes, their opinions appear to be inconsistent with their own notes. For instance, a fair reading of Ivy's notes reflects that Merrell's mental status fluctuated over time. On May 18, 2015, he reported that his medications were working "really well," see Transcript at 815, but he thereafter reported increased anxiety and hallucinations. Ivy observed that Merrell's anxiety was relieved by attending church, keeping a journal, and listening to music. On November 20, 2015, he reported that his medication was helping tremendously, see Transcript at 1004, but he again thereafter reported increased anxiety and hallucinations. A fair reading of Rodriguez's notes reflects similar findings with respect to many of Merrell's physical impairments: they improved at times and grew worse at other times.

Merrell maintains that to the extent Ivy and Rodriguez's opinions lack detail, the ALJ should have asked them to elaborate on their opinions. Merrell alternatively maintains that the ALJ could have obtained "consultative opinions as part of her duty to develop the record …" See Docket Entry 13 at 32.

The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for her to have made an informed decision. It is true that the ALJ could have contacted Ivy and Rodriguez and asked them to elaborate on their opinions. It is also true that the ALJ could have obtained a consultative opinion on Merrell's ability to perform work-related activities. Although either endeavor would have been helpful in assessing Merrell's residual functional capacity, the ALJ was not required to undertake either endeavor.[3] The ALJ could and did properly make the assessment on the basis of the evidence in the record.

---

[3] With respect to whether a consultative opinion is required, the Court of Appeals observed the following in Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016):

… "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619. However, there is no requirement that an [residual functional capacity] finding be supported by a specific medical opinion. See Myers, 721 F.3d at 526-27 (affirming RFC without medical opinion); Perks v. Astrue, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same).

… In the absence of medical opinion evidence, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011). …

Merrell alternatively maintains that having given Ivy and Rodriguez's opinions little weight, and having not obtained a consultative opinion, "the ALJ was left with the opinions of nonexamining physicians, to which she gave great weight." See Docket Entry 13 at CM/ECF 33. It is Merrell's contention that "[s]uch opinions ... do not constitute substantial evidence that Merrell is not disabled." See Docket Entry 13 at CM/ECF 33.

The ALJ relied upon the opinions of the state agency medical professionals in assessing Merrell's residual functional capacity. They agreed that Merrell was capable of performing light, unskilled work. Were their opinions the only evidence relied upon by the ALJ, the Court would likely agree with Merrell. Their opinions, though, were not the only evidence relied upon by the ALJ. The record reflects that the ALJ also relied upon the medical testing; the treatment notes of Merrell's treating and examining physicians; and evidence relevant to his daily activities, social functioning, and concentration, persistence, or pace.

With respect to Merrell's mental impairments, the evidence reflects that they fluctuated over time, and their frequency and severity hinged upon whether he was compliant with his medication. When he was compliant, his symptoms responded favorably and were less frequent and severe. His symptoms also responded favorably to other non-medical means of treatment, i.e., attending church, keeping a journal, and listening to music. There appears to have also been a situational component to his anxiety as he was oftentimes worried about his physical health and about meeting his child support obligations. His mental impairments were certainly not aided by his occasional illegal drug use.

With respect to Merrell's physical impairments, the medical evidence is largely unremarkable and reveals no truly disabling condition. X-rays of his feet showed erosive arthropathy and possible gout. X-rays of his ankles were unremarkable. A pelvic x-ray indicated degenerative arthrosis of the hips, and a lumbar x-ray indicated mild multilevel discogenic degenerative changes, osteophytosis, and some facet arthropathy. A chest x-ray was unremarkable. His sarcoidosis responded favorably to medication, as did his neuropathy. It is true that he had difficulty controlling his diabetes and blood sugar, but the evidence suggests that he was not always compliant with his medication. Gollapalli observed that Merrell had a normal gait and station and normal strength and tone in his extremities. Merrell was able to heel-to-toe, heel walk, and toe walk. Palpation of his cervical joints, sacroiliac joints and lumbar facet joints failed to reproduce pain. Although he represented that his daily activities were quite restricted, i.e., he cannot put a shirt on or off, or put on a belt, without assistance, there is nothing to substantiate such an extreme limitation of his daily activities.

Merrell also maintains that his residual functional capacity was erroneously assessed because "the record casts great doubt on [his] ability to perform the exertional requirements of light work …" See Docket Entry 13 at 35. He maintains that a November of 2015 nerve conduction study showed moderate polyneuropathy consistent with diabetes, and it is unlikely that someone with those symptoms could stand and/or walk for at least six hours in an eight hour workday. Moreover, he notes that he has consistently complained of pain, "connected in part with sarcoidosis, for which he has seen a pain specialist and has been treated with opioids. This would likely affect his ability to perform even sedentary work." See Docket Entry 13 at 34.

The ALJ noted the results of the EMG study performed in November of 2015, specifically noting that the results were abnormal with a "moderate polyneuropathy consistent with diabetes." See Transcript at 27. The results of the EMG study were one of the reasons the ALJ limited Merrell to light work, and the ALJ could find as she did.

The Court accepts Merrell's representation from the Merck Manual that polyneuropathy is a "pins-and-needles sensation, numbness, burning pain, and loss of vibration sense and position sense (knowing where the arms and legs are) are prominent symptoms." See Docket Entry 13 at 34. The description of the condition is consistent with his complaints of numbness, tingling, and pain in his arms and legs. Although the extent to which the condition affects his residual functional capacity is not clear, the ALJ could and did find that other evidence in the record establishes that Merrell can nevertheless perform the standing and/or walking requirements of light work. For instance, when Merrell was seen by Dr. Jeffrey Cohen, M.D., ("Cohen") on January 2, 2015, for a sarcoidosis check-up, Merrell reported lung pain but described it as "nothing unusual." See Transcript at 607. Merrell had normal respiratory rhythm and effort, and palpation of his chest revealed no abnormalities. He had a normal gait, normal movement in his extremities, and normal muscle strength and tone. When Gollapalli saw Merrell in March of 2016 and again in May of 2016, Gollapalli observed, inter alia, that Merrell had a normal gait and station and normal strength and tone in his extremities. Gollapalli observed that medication helped control the pain Merrell was experiencing and, apparently for that reason, Gollapalli continued Merrell on his pain medication therapy. It is telling that Gollapalli advised against bed rest but encouraged Merrell to maintain his normal activities.

Merrell last maintains that his residual functional capacity was erroneously assessed because the severity of his mental impairments were underestimated. Specifically, Merrell maintains that while he was limited to simple work, the limitation does not adequately account for his difficulties in concentration, persistence, or pace.

With respect to Merrell's concentration, persistence, or pace, the ALJ found moderate difficulties. The ALJ supporting his finding by noting the following:

> ... [Merrell] testified that he is able to read, write, and perform simple calculations. [He] watches television and read books, which suggests he is able to maintain some focus. The auditory hallucinations distract him from performing tasks; however, he is able to persist despite them for some activities. The voices become worse when under stress. [His] memory is grossly intact. ...

See Transcript at 25. It was for that reason the ALJ limited Merrell to simple/unskilled work, and the ALJ could find as she did.

The evidence reflects that Merrell's mental impairments responded favorably to medication, reducing their frequency and severity when he took the medication as prescribed. His symptoms also responded favorably to other non-medical means of treatment, and there appears to have been a situational component to his anxiety. His daily activities also reflect no more than moderate difficulties in maintain persistence, concentration, or pace.

The governing standard, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Merrell's residual functional capacity that limited him to light, simple/unskilled work, and Merrell has not shown how the ALJ erred in doing so. In short, the ALJ could find as she did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Merrell's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 23rd day of April, 2018.

_____
UNITED STATES MAGISTRATE JUDGE